UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ESTATE OF ERIK HAAK BY SPECIAL
ADMINISTRATOR SHARON HAAK,
CARL HAAK, and SHARON HAAK,

          Plaintiffs,

and

MEDICARE AND MEDICAID c/o CENTERS FOR
MEDICARE AND MEDICAID SERVICES,
THE SCOTTS COMPANY LLC, et al,

          Subrogated Parties,

v.                                                                                 Case No. 17-C-128

KATLIN E. REYNIERS, BLAZE R. NELSON,
BRYCE D. BUTT, JENNIFER N. SCHWANDT,
REBECCA L. NORTON, CODY J. MARSCHALL,
HANNAH HAMILTON, TOUGER YANG,
RANDY KERSWILL, MD, NICOLE KRUSE,
THOMAS SPEECH, MD, CHRISTINA ZIMMER, and
WILBUR SARINO,

          Defendants.

**DECISION AND ORDER**

      This case arises out of the tragic death of Erik Haak at the Winnebago Mental Health Institute (WMHI), a state facility that provides care and treatment for individuals with serious mental health conditions. Plaintiffs Sharon and Carl Haak, Erik's parents, and the estate of Erik Haak brought this action under 42 U.S.C. § 1983, asserting thirteen WMHI employees were deliberately indifferent to Erik's needs.[1] Plaintiffs also assert claims for negligence under Wisconsin law. The court has jurisdiction over Plaintiffs' § 1983 claim under 28 U.S.C. § 1331 and supplemental

---

[1] Plaintiffs concede summary judgment is appropriate with respect to their claims against Dr. Thomas Speech, Dr. Randy Kerswill, and Nurse Nicole Kruse.

jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Presently before the court is Defendants' motion for partial summary judgment. For the reasons set forth, Defendants' motion will be granted with respect to the federal claims. The court will dismiss Plaintiffs' state law claims without prejudice. The case will be dismissed.

## BACKGROUND

Erik Haak was born with Down Syndrome. In 2015, Erik was 33 years old, was just over five feet tall, weighed approximately 309 pounds, and had the mental capacity of a four year old. Prior to being admitted to WMHI, Erik lived with his parents, Sharon and Carl Haak. Erik's father began observing signs of behavioral changes in Erik as early as December 2014. He noticed Erik did not eat like he used to, was not as happy as he used to be, and did not enjoy things as he had in the past. Although Erik had expressed his anger by throwing things, yelling, and hitting throughout his whole life, his episodes of throwing had gotten worse and increased with frequency. When Erik had an explosive episode, the Haaks allowed Erik to be alone for as long as five to ten minutes to allow Erik to calm down out of concern that someone might get injured by any items Erik threw.

The Haaks ultimately sought treatment options for Erik's intermittent-explosive episodes. On May 18, 2015, the Haaks took Erik to the emergency room due to his behavior. Mrs. Haak explained that their home had become a very unsafe environment for them all because Erik had destroyed their house and was becoming out of control. The emergency room physician examined Erik and noted Erik showed signs of dementia. The following day, Mrs. Haak called Erik's primary doctor, Dr. Thomas Reiners, to ask what steps the Haaks should take in treating Erik. She indicated that Erik's "abrupt" and "disruptive" behavior had been hard on the family. Defs.' Proposed Findings of Fact (DPFOF) ¶ 17, ECF No. 69.

2

The Haaks explored placing Erik in a number of facilities, but none of the facilities were acceptable to Erik. Erik's Care Wisconsin case manager, Jamie Gaines, recommended that Erik be admitted to WMHI. Gaines advised the Haaks that for Erik to be admitted to WMHI, police had to escort Erik from his house to the hospital, where he would then be referred to WMHI for an involuntary admission.

On May 20, 2015, Erik had an intermittent-explosive episode where he threw things around the house. This outburst was worse than Erik's previous episodes and prompted the Haaks to call the police. Police and the Jefferson County sheriff responded to the Haaks' residence, and the police took Erik to Watertown Regional Medical Center. Hospital staff conversed with Mrs. Haak over the telephone. Mrs. Haak explained that Erik sat at the dining room table with family then threw an item at his sister, causing an abrasion to the bridge of her nose. Erik's other sibling, who is deaf, told Mrs. Haak that she was afraid Erik would also harm her. *Id.* ¶ 28. Hospital staff referred Erik to WMHI for an involuntary admission.

WMHI is staffed by registered nurses and psychiatric care technicians (PCTs). PCTs are generally responsible for monitoring the housing unit. They deliver food, clean, set up bedrooms, assist some patients with hygiene, occasionally take some vitals, conduct rounds, and communicate with patients. PCTs also document patient behavior. PCTs take the following training courses: Pro-Act training, which instructs PCTs to avoid using restraints, Crisis Prevention Management, and CNA licensing. While nursing staff communicate with each other through shift reports, PCTs typically do not review shift reports and communicate with each other using progress notes or PCT notes.

On the night of Erik's admission, WMHI staff spoke to Mrs. Haak. Mrs. Haak explained that on May 20, 2015, Erik became aggressive without any provocation and began breaking glass

3

containers in the bathroom. DPFOF ¶ 33. Based on a telephone interview with Mrs. Haak, Nurse Nicole Johnson (formerly Kruse) completed an Initial Nursing Assessment. Nurse Johnson noted that staff should respond to Erik's outbursts by leaving him alone and ignoring his behavior. ECF No. 63-1 at 3. WMHI staff also completed the individualized treatment plan (ITP) form for Erik. The ITP included Erik's biographical information, treatment goals, and methods of treatment. Although the plan did not address methods of restraint to be used on Erik or include any specific information as to how staff should de-escalate him in the event he had an outburst, Erik's medical file contained information on de-escalation.

Dr. Wilbur Sarino also spoke with Mrs. Haak, upon Erik's admission. He reviewed the ITP, made notes regarding Erik's behavior, and approved the ITP. Plaintiffs contend Dr. Sarino did not know the specifics of how the ITP was compiled or why Erik was admitted to WMHI; approved goals that he did not think Erik could achieve; and did not include any information about the risk factors of restraint and how to safely restrain Erik or the medications Erik took—Klonopin and Seroquel—or their effects. Erik was never physically restrained proir to his admission at WMHI. WMHI did not assign a primary nurse to Erik for the entirety of his stay, and staff did not create a behavioral plan for Erik and did not obtain the behavior plan used at Opportunities, Inc., Erik's workplace.

On May 21, 2015, Erik hit another patient. Although Erik began to yell after Nurse Johnson told him to go to his room, Erik eventually went to his room. Erik took his prescribed Klonopin and, after much encouragement, fell asleep on his bed. The following day, Erik began hitting himself and was redirected by staff after several prompts. Later that day, Nurse Christina Zimmer reported that Erik was hitting the walls in the day room, crying, and screaming. Staff told Erik to go to his room

4

and ignored him when he did not immediately comply. Erik then went to his room. Staff gave Erik Klonopin with little effect. On May 23, 2015, Erik sat in the vestibule hitting the walls and screaming. Nurse Hess reported that Erik was ordered to his room, but he would not comply. After multiple prompts, Erik walked to his room and sat down by the door. Staff gave Erik the antipsychotic medication Geodon, which was effective. WMHI completed a seven-day review on May 27, 2015. Staff noted Erik had several instances of throwing objects and hitting since his admission.

On May 30, 2015, Erik became aggressive, yelled, and kicked. Dr. Sarino approved a floor restraint, and staff gave Erik a shot of Haldol to calm him down. Even though WMHI policies require that an ITP be reviewed and updated after restraint procedures are used, Dr. Sarino did not update the ITP after the May 30, 2015 restraint incident because he believed this was the first restraint incident Erik had at WMHI. Dr. Sarino also did not note that leaving Erik alone when he was acting out had been effective in the past.

Nurse Zimmer, the registered nurse on duty on June 5, 2015, gave Erik his nighttime Seroquel around 7:30 p.m. Shortly thereafter, Erik witnessed another inmate bite PCT Blaze Nelson and PCT Jedadiha Dorow. Erik walked into the day room at approximately 8:00 p.m. and struck a patient who was watching television. He also flipped over a table and sat behind it. PCT Hannah Hamilton ran into the day room to talk to Erik. He indicated that he wanted a soda and a donut. Staff cleared the day room of all patients, except Erik. Other staff members spoke with Erik in an attempt to de-escalate him. Erik stated that he wanted to speak to his father, and Hamilton tried to contact Mr. Haak. PCT Nelson continued to monitor the situation. Hamilton returned and indicated she was unable to reach Mr. Haak. Plaintiffs contend that the Haaks never received a call from

5

WMHI before Erik stopped breathing. Nelson left the day room to report the incident to Nurse Zimmer. Zimmer was pregnant at the time, and staff tried to keep her in the nurse's station as much as possible. In the meantime, Erik sat on the floor and appeared to begin calming down once he was alone in the day room. When another patient entered the day room, however, Erik violently pushed her. PCT Nelson returned from the nurse's station and noticed Erik walking down the hallway toward his room.

Nelson and Schwandt placed their hands on each of Erik's arms as Erik walked toward his room. Once the PCTs initiated physical contact, Erik began swinging his elbows, which prompted Nelson and Schwandt to grab his arms. At that point, Erik sat on the ground. Defendants contend PCTs consulted with Nurse Zimmer, who was working to de-escalate the patient Erik had pushed, on how to proceed. The staff collectively agreed to put Erik on a transboard.

Nelson and other PCT staff initiated a floor containment and placed Erik on his stomach. An all-building alert sounded so that available staff would report for back-up assistance. PCTs Touger Yang, Bryce Butt, Katlin Reyniers, and Cody Marschall responded to the building alert. At one point during the restraint, there were at least eight people holding Erik down. Nelson held Erik's arm. Hamilton laid her weight on Erik's upper thigh and butt area. PCT Rebecca Norton restrained Erik's legs, and Marschall stated he attempted to reach over Erik's back and then chest to hold Erik's right arm. Although Marschall may have contacted Erik's back and chest while reaching over him, he denies putting any weight on him. Schwandt held Erik's head against the floor. Schawandt turned Erik's head to the side and placed her hands on his ear. One of her forearms would have been adjacent to Erik's mouth and nose area. Erik stuck out his tongue and began spitting. PCTs Schwandt and Butt put a spit hood on Erik. The spit hood did not fit well over Erik's head, but none of the staff believed that it impaired his ability to breathe.

6

Staff obtained a transboard to assist in restraining Erik.  The PCTs first restrained Erik's left wrist and ankle to the transboard before rolling Erik over.  Yang relieved Nelson so that Nelson's finger, which had been injured that evening, could be treated.  Reyniers helped flip Erik onto his back then helped place restraints on Erik.  While staff pulled extra restraints out of a bag, Hamilton noticed Erik's face was turning blue, and she exclaimed that she did not believe he was breathing.  The PCTs immediately removed the spit hood.  Hamilton ran to the nurse's station, pounded on the window, and yelled to Nurse Zimmer that Erik was not breathing.  Nelson called the emergency hotline.  Zimmer directed Hamilton to get an individual electric defibrillator (IED), then went to administer CPR.  Zimmer and Nurse Jessica Walsh rotated in providing CPR until emergency medical technicians (EMTs) arrived.  The EMTs took Erik to the hospital, and he was admitted at approximately 9:31 p.m.  Erik was pronounced dead on June 6, 2015, at 5:03 a.m.  None of the defendants recall with certainty how long Erik was restrained, but their estimates range from five to ten minutes.

The Winnebago Coroner's office performed an autopsy.  Assistant Medical Examiner Dr. Kristinza Giese concluded Erik died primarily of mechanical asphyxiation, with other significant conditions being Erik's morbid obesity, Down Syndrome, and intermittent explosive disorder.  Dr. Giese found that the restraint incident caused his death.  She explained that placing pressure on an individual's chest makes it difficult for him to breathe because it affects the ability to expand and contract the chest.  Dr. Giese believed Erik's injuries were inconsistent with the claim that no pressure was applied to his chest while he was being restrained.

The Oshkosh Police Department investigated Erik's death by interviewing various WMHI staff on June 5, 2015.  The Division of Quality Assurance (DQA) also performed an investigation.

7

It issued a plan of correction and issued WMHI citations. The plan of correction required WMHI to apply restraints consistent with the patient's pre-existing medical conditions and individualize treatment plans to the needs of the patient.

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences that favor them in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

**I. Due Process Claims**

Plaintiffs contend that Erik's placement in restraints violated his rights under the Due Process Clause of the Fourteenth Amendment. Under the Due Process Clause, an institutionalized individual in state custody "enjoys constitutionally protected interests in conditions of reasonable care and

8

safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982). "Liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Id.* at 316 (citation omitted). "Although an individual committed involuntarily to a mental institution is . . . entitled to 'more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish,' . . . he does not enjoy an absolute right to freedom of bodily movement." *Thielman v. Leean*, 140 F. Supp. 2d 982, 990 (W.D. Wis. 2001) (quoting *Youngberg*, 457 U.S. at 322). "In operating [a mental health facility], there are occasions in which it is necessary for the State to restrain the movement of residents—for example, to protect them as well as others from violence." *Youngberg*, 457 U.S. at 320. In addition, while long-term treatment decisions should normally be made by a qualified professional, "day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons." *Id.* at 323 n.30. Under a substantive due process analysis, "the question is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint . . . is such as to violate due process." *Id*. at 320.

In determining whether a plaintiff's interests have been infringed, the Court in *Youngberg* held that a court must determine whether "professional judgment in fact was exercised" by a person competent, whether by education, training or experience, to make the particular decision at issue. *Id.* at 321, 323 n.30; *see also Collignon v. Milwaukee Cty.*, 163 F.3d 982, 988–89 (7th Cir. 1998) ("the professional judgment standard only applies to decisions made by professionals such as physicians, psychiatrists, and nurses within their area of professional expertise"). "As a practical

9

matter . . . there is little difference between the Eighth Amendment standards regarding the conduct of prison medical professionals' treatment of prisoners' medical needs, and substantive due process' standards regarding the conduct of other medical professionals' treatment of detained or committed persons' medical needs." *Collignon*, 163 F.3d at 988.

A claim for deliberate indifference under the Eighth Amendment must establish "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that claim." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012). Similarly, the professional judgment standard requires that the plaintiff show that the professional knew of the plaintiff's serious medical need and disregarded that need. *Collignon*, 163 F.3d at 989. Defendants do not dispute that Erik had serious medical needs. Therefore, the focus is on whether Defendants disregarded those needs. "A plaintiff can show that the professional disregarded the need only if the professionals' subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Id.*; *see also Youngberg*, 457 U.S. at 323 (Plaintiff must show that state actor's decision was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment."). Under the professional judgment standard, a decision made by a professional is presumptively valid—"[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Youngberg*, 457 U.S. at 321. With these standards in mind, the court will turn to Plaintiffs' claims against each defendant.

### A. Dr. Sarino

Plaintiffs contend Dr. Sarino failed to exercise professional judgment in his treatment decisions. As an initial matter, Plaintiffs assert that WMHI was not the appropriate facility for

10

someone with Down Syndrome or developmental disabilities, and Dr. Sarino failed to exercise professional judgment in deciding to admit Erik to WMHI. But it is undisputed that Erik was detained by Jefferson County authorities pursuant to Section 51.15 of the Wisconsin Statutes and his custody was transferred to WMHI, an approved treatment facility. On May 26, 2015, Dr. Sarino testified at a probable cause hearing before Jefferson Circuit Court Judge William F. Hue that Erik met the requirements for involuntary commitment and that WMHI was the best option for Erik at that time. He noted that, because Erik's recent aggressive behavior created a substantial risk of serous harm to Erik and others, Erik had a primary need for residential care and custody until he was safe to return to his parents' home. ECF No. 94-9 at 17, 19. Dr. Sarino explained that Mrs. Haak was concerned that Erik had shown aggression to his sisters, who also had special needs, in the past and would inflict harm on them if he returned home. *Id.* at 19. Erik's court-appointed attorney did not present any evidence and offered no objection to his continued placement at WMHI. *Id.* at 20. The court therefore found probable cause to believe that Erik was an appropriate subject for temporary protective placement for a period of thirty days. *Id.* at 21. While Plaintiffs' expert disagrees with Dr. Sarino's opinion that Erik remain at WMHI so that he would not harm himself or others, Plaintiffs have not established that Dr. Sarino's treatment decisions were such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that Dr. Sarino did not base his decision on his medical judgment.

Plaintiffs also contend that Dr. Sarino failed to exercise professional judgment in preparing an ITP for Erik. In particular, Plaintiffs assert the ITP was not sufficiently individualized to Erik's treatment. On May 21, 2015, WMHI staff completed the ITP form for Erik. The ITP included Erik's biographical information as well as goals and treatment plans, which included helping Erik

"identify stressors that lead to high-risk behaviors to self and/or others and develop coping skills that may assist in managing/preventing further crises" by assessing the need for increased monitoring due to self-harm, aggression to others, and vulnerability. ECF No. 48-1 at 1, 3. Erik's physicians, his primary nurse, and social worker would meet with Erik on a weekly basis and work with Erik, his family, and community workers to facilitate Erik's discharge to a less restrictive setting. *Id.* at 4. After speaking with Mrs. Haak, Dr. Sarino reviewed the ITP, made notes regarding Erik's behavior, and approved the plan.

Though Plaintiffs maintain that Dr. Sarino's decisions about Erik's treatment were not acceptable, they have not presented evidence that Dr. Sarnio's ITP decisions departed so radically from accepted professional judgment, practice, or standards that would allow a jury to reasonably infer that his decisions were not based on professional judgment. Plaintiffs criticize the ITP because it was never changed or updated, it did not explain how to safely restrain Erik, and it did not contain any information about his medical and physical issues. Plaintiffs' expert also opined on ways in which the ITP could have been improved. But this testimony does not establish that Dr. Sarino did not exercise professional judgment or that his decision was so far afield of accepted medical standards to raise the inference that it was not based on his professional judgment. At most, these contentions amount to a disagreement about what information should have been contained in the plan. While mere disagreements with the treatment plan "might state a negligence cause of action, it cannot make out a substantive due process claim." *Collignon*, 163 F.3d at 990 (citing *Youngberg*, 457 U.S. at 321). In addition, Plaintiffs maintain that the ITP did not comply with WMHI's policies. But a violation of a state statute or institution policy cannot constitute a constitutional violation. *See Sobitan v. Glud*, 589 F.3d 379, 389 (7th Cir. 2009) ("By definition, federal law, not state law,

provides the source of liability for a claim alleging the deprivation of a federal constitutional right."). Dr. Sarino provided reasonable care and treatment, and his decisions related to the ITP did not violate Erik's constitutional rights.

### B. Nurse Zimmer

Plaintiffs contend Nurse Zimmer failed to exercise professional judgment with respect to the June 5, 2015 restraint incident. They argue that Zimmer did not decide whether restraining Erik was appropriate and allowed the PCTs to make the decision in violation of WMHI policy and Wisconsin statutes. Again, a violation of state statute or institution policy does not create a constitutional violation. *See Sobitan*, 589 F.3d at 389.

In addition, Nurse Zimmer did not delegate any decisions regarding restraining Erik to the PCTs. After Erik pushed the second patient, Zimmer tried to de-escalate that patient at the same time PCTs attempted to physically escort Erik to his room. Once that patient calmed down, PCT staff consulted with Nurse Zimmer on how to proceed with Erik, who swung his elbows to avoid the physical escort, sat on the ground, and did not continue to his room. Zimmer and the PCTs decided to place Erik on a transboard because he was aggressive, fighting, and yelling. Zimmer did not observe the PCTs' attempt to restrain Erik on the transboard because she was filling other patient needs and treating the wound to Nelson's finger in the nurse's station. As Zimmer proceeded to get anti-anxiety medication for a female patient, PCT Hamilton tapped on the nurse's station window and advised Zimmer that Erik was not breathing. Zimmer Dep. 49, 51, ECF No. 50 at 14. Zimmer directed PCT Hamilton to get an IED and began administering CPR.

While Plaintiffs criticize Zimmer's conclusions, these are the type of decisions committed to her professional judgment and must be afforded deference. *Youngberg*, 457 U.S. at 323. The way

13

in which Zimmer prioritized the medical needs of Erik, other patients, and Nelson's injury and the decision to place Erik on a transboard due to his aggressive behavior were acceptable under the emergent circumstances she faced. Plaintiffs have offered no evidence that Zimmer failed to exercise professional judgment or that her judgment was a substantial departure from accepted professional judgment. They cite to *Davis v. Rennie*, 264 F.3d 86 (1st Cir. 2001), and *Mombourquette ex rel. Mombourquette v. Amundson*, 469 F. Supp. 2d 624 (W.D. Wis. 2007), for the proposition that nurses have an affirmative duty to act and abate known, serious risks, but these cases are distinguishable from the case at hand. In *Davis*, a nurse and other mental health workers were found to have violated an involuntarily committed mental health patient's rights when they observed—but did not stop—a guard repeatedly punching the patient in the head during a physical restraint. The court noted that "[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance." *Davis*, 264 F.3d at 98 (citation omitted). In *Mombourquette*, a pretrial detainee who was left seriously brain damaged after she attempted suicide brought a suit pursuant to 42 U.S.C. § 1983. 469 F. Supp. 2d at 626. In denying the defendants' motions for summary judgment, the court concluded a reasonable jury could find deliberate indifference where a nurse, who knew of the detainee's two prior suicide attempts within the past ten days, did not respond reasonably to the risk of suicide. In particular, the court noted that the nurse took virtually no action to protect the detainee, she failed to place the detainee on suicide watch, did not order more frequent cell checks, and did not take any objects the detainee could use to hurt herself away. *Id.* at 645–46.

In this case, Zimmer did not have a realistic opportunity to intercede as the nurse in *Davis* did. Zimmer was not present for the restraint because she was in the nurse's station treating other

14

medical needs and did not observe the PCTs' conduct. Although Zimmer was generally aware of the risk of asphyxiation associated with placing a morbidly obese patient on his stomach during a restraint, there is no evidence that Zimmer was aware of a specific risk of death at the time the PCTs restrained Erik. Once she was aware that Erik was not breathing, she immediately administered CPR. Defendants have demonstrated Zimmer exercised professional judgment, which must be given deference. Summary judgment on Plaintiffs' due process claim with respect to Zimmer is therefore appropriate.

### C. PCTs

Plaintiffs maintain that the PCTs' actions violated Erik's constitutional rights. Because the PCTs are not trained professionals, the deliberate indifference standard, rather than the professional judgment standard, applies. *See Youngberg*, 457 U.S. at 323 n.30; *Clark v. Donahue*, 885 F. Supp. 1164, 1168 (S.D. Ind. 1995) ("Where the hospital employee is in no way a trained professional, either administratively or medically, there is no professional judgment to evaluate."). The Seventh Circuit has applied the same deliberate indifference standard under both the Eighth and Fourteenth Amendments. *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013) ("For claims of deliberate indifference . . . this Court has previously 'found it convenient and entirely appropriate to apply the same standards to claims arising under the Fourteenth Amendment . . . and Eighth Amendment . . . without differentiation.'" (quoting *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005))). A claim for deliberate indifference must establish "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that claim." *Gomez*, 680 F.3d at 865. Because Defendants do not dispute that Erik had objectively serious medical needs, Plaintiffs must only demonstrate that the PCTs were deliberately indifferent to his medical needs.

While a plaintiff need not show that the official intended harm or believed harm would occur to establish deliberate indifference, it is not enough to show that officials merely failed to act reasonably. *Gibbs v. Franklin*, 49 F.3d at 1206, 1208 (7th Cir. 1995). Deliberate indifference requires more than negligence or even gross negligence; it requires that the defendants knew of, yet disregarded, an excessive risk to Erik's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 835, 837 (1970); *see also Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976); *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016) ("A state officer is deliberately indifferent if he does nothing . . . or when he takes action that is so ineffectual under the circumstances that deliberate indifference can be inferred."). Indeed, "[e]ven objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known—is insufficient to make out a claim." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citations omitted). The plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

In this case, deliberate indifference cannot be inferred from the PCTs' conduct. As an initial matter, Plaintiffs again argue that Erik's restraint violated WMHI policies, but the failure to follow institutional protocol does not create a constitutional violation. Plaintiffs further argue that Erik's restraint was done with deliberate indifference to Erik's constitutional right to be free from restraint. While liberty from bodily restraint has been recognized as the core of the liberty protected by the Due Process Clause, the Supreme Court has acknowledged that there are occasions in which it is necessary for the State to restrain the movement of individuals committed involuntarily to a mental institution—"for example, to protect them as well as others from violence." *Youngberg*, 457 U.S.

at 316, 320. "[D]ay-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training." *Id.* at 323 n.30. Defendants have demonstrated that the circumstances here warranted immediate action by the PCTs. Though the end result of their actions may be tragic, the PCTs were not deliberately indifferent.

Nelson and Schwandt placed their hands on Erik's arms to guide him back toward his room only after Erik struck one patient, pushed another, and flipped over a table. They believed an escort was necessary for the safety of other patients. Once the PCTs initiated physical contact, Erik began swinging his elbows. Nelson and Schwandt grabbed Erik's arms to stop them from swinging, and Erik sat on the ground. At that point, the PCTs consulted with Nurse Zimmer and agreed to put Erik on a transboard due to Erik's aggressive behavior. Nelson and other PCT staff initiated a floor containment and placed Erik on his stomach so that they could restrain his wrist and ankle to the transboard before rolling him onto the board. When Erik started spitting, staff placed a spit hood on Erik. In short, the record demonstrates that the restraint decisions were necessary in light of the emergent situation and Erik's aggressive behavior.

In addition, Plaintiffs have not presented evidence that the PCTs knew of but disregarded an excessive risk to Erik's safety when they initiated the two-person escort or the floor containment. As to the two-person escort, there is no evidence that the PCTs knew that holding onto Erik's arms to guide him to his room posed a substantial risk of serious injury or would lead to the series of events that ensued. The PCTs initiated the floor containment so that they could secure Erik's wrist and ankle to the transboard before rolling him completely on the board. Plaintiffs maintain that the PCTs created a substantial risk to Erik's safety when up to eight PCTs held him on his stomach for

17

five to ten minutes and one PCT may have laid over Erik's back, despite the fact that Erik was obese and had a large abdomen. But there is no evidence that the PCTs knew or suspected that initiating the floor containment or applying a spit hood would create a substantial risk of death. Indeed, the PCTs were not aware that Erik had difficulty breathing during the restraint. Though the PCTs knew the spit hood did not fit well over Erik's head, none of them believed it impaired his ability to breathe. Once Hamilton noticed Erik's face was turning blue, the PCTs removed the spit hood, Hamilton advised Zimmer of Erik's condition, Nelson called the emergency hotline, and Zimmer began CPR. Though Plaintiffs maintain the PCTs' actions were unreasonable, they have not established that the PCTs were deliberately indifferent. Because Plaintiffs have not shown that the PCTs "knowingly exposed [Erik] to a substantial danger to his health for no good reason," *Egebergh v. Nicholson*, 272 F.3d 925, 928 (7th Cir. 2001), the PCTs are entitled to summary judgment on Plaintiffs' Fourteenth Amendment claim.

**II. Negligence Claims**

Plaintiffs have also alleged state law negligence claims against Defendants. Generally, when federal claims drop out of a case, federal courts decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3); *see Carlsbad Tech. Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). The Seventh Circuit has described a "sensible presumption that if the federal claims drop out *before trial*, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007); *see also Groce v. Eli Lilly & Co.*, 193 F.3d 496, 502 (7th Cir. 1999) (noting that the rule is dismissal unless state claims are frivolous or a "no brainer").

Nothing in this case suggests that the presumption should be ignored. Accordingly, Plaintiffs' state claims against the defendants will be dismissed without prejudice so that they may be pursued in a state forum.

**III. Plaintiffs' Motions to Seal**

Plaintiffs filed two motions to seal documents in conjunction with their response brief to Defendants' motion for partial summary judgment. Neither bare assertions of confidentiality, nor the agreement of the parties, is enough to warrant restricting documents from the public. In order to show good cause to restrict a document, the party requesting protection must "analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations." *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 548 (7th Cir. 2002). Plaintiffs have filed motions requesting that the following documents be restricted: (1) Exhibit 9, the transcript of the May 26, 2015 probable cause hearing; (2) Exhibit 5, a copyrighted crisis management training manual; (3) Plaintiffs' brief in opposition to Defendants' motion for partial summary judgment; and (4) Plaintiffs' proposed findings of fact. I am satisfied that Plaintiffs have met their burden to restrict Exhibits 5 and 9. The parties agree that the transcript of the probable cause hearing is confidential pursuant to Wis. Stat. § 51.30(4) and should be restricted because it contains sensitive medical information. In addition, the training manual appears to contain sensitive information that is not generally available to the public. Plaintiffs have not shown cause to restrict their response brief or their proposed findings of fact, as they have offered no basis for their request. Accordingly, the motions are granted as to Exhibits 5 and 9 only.

**CONCLUSION**

For the reasons set forth above, the defendants' motion for summary judgment (ECF No. 67) is **GRANTED** as to the federal claims, and such claims are dismissed. Plaintiffs' state law claims

19

are dismissed without prejudice. Plaintiffs' motions to restrict documents (ECF Nos. 90, 101) are **GRANTED** as to Exhibits 5 and 9 (ECF Nos. 94-5, 94-9), which will remain restricted. The motion is **DENIED** as to Plaintiffs' brief in opposition and Plaintiffs' proposed findings of fact (ECF No. 95, 97), and the Clerk is directed to remove the restriction from these documents. The Clerk is directed to enter judgment accordingly.

      **SO ORDERED** this  12th  day of October, 2018.

                                      s/ William C. Griesbach
                                      William C. Griesbach, Chief Judge
                                      United States District Court